# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC KELLERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 06cv0528 |
| | ) | |
| UPMC ST. MARGARET, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

February 11, 2008

Presently before the Court for disposition is the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Defendant, UPMC St. Margaret ("SMH") (*Document Nos. 14 and 15,* respectively), and the brief and response in opposition filed by Plaintiff, Eric Kellerman (*Documents No. 21 and 22*), and the REPLY BRIEF filed by SMH (*Document No. 27*).

The issues have been fully briefed and the matter is ripe for disposition. After a careful consideration of the motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff on his claims of sexual harassment and retaliation brought under Title VII of the Civil Rights Act fo 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). Accordingly, the motion for summary judgment will be granted.

### PROCEDURAL BACKGROUND

Plaintiff, Eric Kellerman ("Plaintiff") brought this lawsuit on April 20, 2006, by the filing of a three-count Complaint against his former employer, SMH. Plaintiff alleges that (i)

he was sexually harassed by a female co-worker and that (ii) his employment was unlawfully terminated in retaliation for having complained about the sexual harassment.

SMH has filed the instant motion for summary judgment in which it contends that it is entitled to judgment as a matter of law because Plaintiff is unable to establish (i) a *prima facie* case of sexual harassment; and (ii) a *prima facie* case of retaliation.

## Background

As the law requires, all disputed facts and inferences are to be resolved most favorable to the Plaintiff.

In January 2003, Plaintiff Eric Kellerman ("Plaintiff") applied for a position as a Medical Laboratory Technician ("MLT") at SMH by forwarding a cover letter and resume to Scott Davis, a UPMC recruiter. Mr. Davis, in turn, then forwarded Plaintiff's cover letter and resume to the SMH human resources department. In his resume, Plaintiff listed his employment history as follows: Best Buy (Present); Primary Health Care; Community College of Allegheny County. By his own admission, his resume did not detail all of his work experience and listed no hospital work experience, although he did in fact have prior hospital work experience.

On January 24, 2003, Plaintiff completed a SMH employment application and submitted it to the SMH human resources department. The employment section of the application requested: "Please account for all periods of employment in the past 10 years . . . ." This section also explicitly stated, in bold text that **"[a] resume is welcome but not as a substitute for completing this section."** Again, Plaintiff only listed the following employment history: Best Buy, Inc. (8/2000 to present); Primary Health Care, Inc. (1997 and

2

2000); and Community College (1991 to 1996). In addition, on the application, Plaintiff responded "No" to the following question: "Were you previously employed by any other hospital?" On the final page of the application, the Plaintiff attested to the following:

> I certify that I fully understand all requests for information contained in this application, and I certify that the information supplied by me, on this form and elsewhere in conjunction with obtaining employment, is complete and correct to the best of my knowledge . . . . **I understand that any false or misleading statements, omission, or misrepresentation on this application will be considered sufficient cause for rejection of this application or dismissal if such information or omission is discovered subsequent to my employment.**

(emphasis added).

Plaintiff alleges that on January 19 and 21, 2003 and again on February 23, 2003, he faxed a second "updated" resume to SMH. However, Plaintiff admits that the "updated" resume did not contain a fully accurate description of his work history. According to Plaintiff, he faxed this updated resume to the SMH human resources department at the following fax number: 1-888-279-0892. However, this was not the fax number for the SMH human resources department in 2003. Rather, the fax number was 412-784-4788.

In March 2003, Sue Ellen Reed, Laboratory Supervisor, and her immediate supervisor, Meredith Naples, Laboratory Director, interviewed Plaintiff for the MLT position. Plaintiff was offered the position and he began working as a part-time MLT in the automated testing laboratory at SMH in March 2003. As an MLT, Plaintiff was responsible for "the accurate performance of routine and STAT laboratory testing," which included testing on blood, urine, and fluids. Throughout his employment with SMH, Plaintiff reported directly to Ms. Reed.

3

Following his training period, Plaintiff worked on the afternoon shift, which was from 1:30 p.m. to 10:00 p.m., although Plaintiff's starting time varied.

On July 15, 2003, Plaintiff was issued a written warning for failing to timely call in or show up for work on two consecutive work days. Upon receipt of the corrective action form, Plaintiff informed Ms. Reed that he was in court on the days in question. The record reflects, however, that Plaintiff was actually in jail on those days because he had been arrested for violating a protection from abuse order entered at the request and on behalf of his wife, Denise Kellerman, and their children.

Plaintiff does not deny that throughout his employment at SMH, he had personal disagreements with several of his co-workers, including Joni Schad, Rachel Sutherland, Chris Einloth, and Jean Nealey, about a variety of work-related issues.

In his Complaint, Plaintiff alleges that Trudy Hemphill, one of his co-workers on the afternoon shift, sexually harassed him. According to Plaintiff, the harassment began in May or June of 2003. Ms. Hemphill (i) asked him questions about his personal life; (ii) sent letters and cards to him at his home address; (iii) called him on his cell phone; (iv) tried to rub his back on two occasions; (v) made "google eyes" at him; and (vi) followed him around at work. Specifically, Plaintiff was offended by Ms. Hemphill's use of words such as "honey," "sweetie," and "sweetheart," and by her general references to his personal life. Plaintiff also claims that he found phrases such as "hang in there honey" and "with love and prayers" to be offensive, as they suggested to him that Ms. Hemphill was infatuated with him.

Plaintiff admits that only one of the letters and/or cards that Ms. Hemphill sent him, a letter dated August 14, 2003, contained graphic sexual content. At the time that Plaintiff

4

received the numerous letters, he did not complain or inform any of his supervisors at SMH that he had received or objected to them.

During the Summer of 2003, Plaintiff continued to socialize with Ms. Hemphill outside of work. For example, he put Ms. Hemphill in touch with Dennis Deminous, a friend of Plaintiff and an insurance agent, so that Plaintiff could purchase a life insurance policy for her husband, Tim Hemphill. In May or June, 2003, Plaintiff gave Ms. Hemphill computer cables for her home computer. On at least one occasion in September or October 2003, Plaintiff and Ms. Hemphill visited a co-worker, Cheryl Coffrini, at her home, so that Plaintiff could fix Ms. Coffrini's ceiling fan. According to Sue Reed, Plaintiff's supervisor, during this time period Ms. Hemphill and Plaintiff were friendly at work and they would talk and laugh together.

However, in early November 2003, Plaintiff complained, for the first time, to Ms. Reed about Ms. Hemphill. During this discussion, Plaintiff complained that Ms. Hemphill was engaging in unwanted personal contact which included telephone calls at his home and on his cell phone, letters and cards sent to his home, invasion of his personal space, and generally bothering him. Plaintiff did not show Ms. Reed what he had received in the mail from Ms. Hemphill nor did he provide her with any information as to what Ms. Hemphill stated in her mailings or alleged telephone calls.

Thereafter, Plaintiff met with again with Ms. Reed, along with Ms. Naples, and Tracey Fantini, human resources consultant, to discuss Plaintiff's complaints about Ms. Hemphill. During this meeting, Plaintiff again stated that Ms. Hemphill was bothering him and complained that she had obtained his home address and telephone number from the laboratory

5

rolodex. Plaintiff did not provide the individuals at the meeting with the August 13, 2003 letter, nor did he mention that Plaintiff's behavior was sexual in nature.

On November 3, 2003, Ms. Hemphill was issued a disciplinary warning for "unwanted personal contact with a co-worker." She was specifically instructed that she was not permitted to contact Plaintiff outside of work, that all interactions between herself and Plaintiff were to be work related, and that she was not to invade Plaintiff's "personal space." Also in response to Plaintiff's concerns, employee addresses were removed from the laboratory rolodex.

Following the November meeting, Ms. Reed periodically checked in with Plaintiff to make sure that things with Ms. Hemphill were okay and that the conduct he had complained of had ceased. Plaintiff responded that there were no further problems.

Despite Plaintiff's November 2003 complaint, and Ms. Hemphill's disciplinary warning that she was not permitted to have contact with Plaintiff outside of work, the two continued to socialize outside of work. For example, on February 14, 2004, Plaintiff met Ms. Hemphill and her husband outside of work so that he could purchase collectable bobble-head dolls from them. In April 2004, Plaintiff met Ms. Hemphill and her husband at a Pittsburgh Penguins hockey game and both had their pictures taken with Mario Lemiuex in his luxury box. After the Hemphills and Plaintiff left the luxury box, Plaintiff briefly returned to Ms. Hemphill's seats and took additional pictures with both Ms. Hemphill and her husband.

On April 14, 2004, Plaintiff sent Ms. Hemphill the following email at work:

> As we discussed in the passed (sic) . . . it is in best intrust (sic) for us to
> not have any contact. I understand you would like to be my friend.
> However, because of many variables it is hampering the whole situation.
> Please understand this. I am not mad at you. I have had too many

comments made to me and would advise that we have no contact. I am
flattered to be your friend and co-worker. Additionally, thanks for the
support and concerns. I hope you can understand this.

After receiving the e-mail, Ms. Hemphill became very upset and showed Ms. Reed the e-mail. Ms. Reed told Ms. Hemphill that she and Plaintiff were supposed to "stay away from each other." In response, Ms. Hemphill stated that she and Plaintiff had continued to socialize outside of work.

Later that same afternoon, Plaintiff, Ms. Hemphill, Ms. Reed, and Ms. Naples met to discuss the email.[1] Ms. Hemphill's husband, Tim, was also in attendance. During this meeting, Plaintiff stated that he longer wanted to be friends with Ms. Hemphill because people were "talking" and there were "rumors" about them circulating throughout the lab. The record reflects that Ms. Naples told both Plaintiff and Ms. Hemphill that it was "difficult to control gossip and comments in the lab staff unless they were gender-, race-, nationality-, religion -, sexual preference related." Document 16-25.

Following April 14, 2004, Ms. Hemphill stopped talking to Plaintiff altogether for a period of time. Plaintiff assumed Ms. Hemphill was leaving him alone because Ms. Reed had talked to her.

On May 14, 2004, Plaintiff sent Ms. Reed and Ms. Naples an e-mail, in which he stated, *inter alia*, that Ms. Hemphill was sexually harassing him. This was the first time that Plaintiff had notified anyone in management or in the human resources department at SMH that Ms. Hemphill's conduct was sexual in nature.

---

[1] Plaintiff denies that he met on April 14, 2004, with Ms. Reed, Ms. Naples and the Hemphills regarding the April 14, 2004 email. However, during her deposition, Ms. Reed testified at length about the meeting.

Three days later, on May 17, 2004, Plaintiff submitted a complaint directly to Roseanne Saunders, the director of human resources. Immediately thereafter, and pursuant to SMH policy, Ms. Saunders conducted an investigation. In preparation for her investigation, Ms. Saunders reviewed both Plaintiff's and Ms. Hemphill's personnel files and disciplinary histories.

Ms. Saunders met with Plaintiff on two occasions to discuss the concerns he had raised in his complaint. During these meetings, Plaintiff stated that Ms. Hemphill was bothering him and that he did not want to be her friend. At the second meeting, Plaintiff provided Ms. Saunders with Ms. Hemphill's August 14, 2003 letter and some post cards that Mr. and Mrs. Hemphill had given to him when he was at their house. It is undisputed that this was the first, and only time, that Plaintiff showed anyone in management or in the human resources department at SMH any of the letters or other materials that Ms. Hemphill had sent or given to him.

Ms. Saunders also met individually with Ms. Hemphill. Ms. Hemphill provided Ms. Saunders with a written statement, which documented her social contacts with Plaintiff from February 2004 through May 2004. Thereafter, Ms. Saunders met with Ms. Naples and Susan Hoolahan, Vice President of Human Resources, to discuss Plaintiff's complaint with regard to Ms. Hemphill.

It was determined that Ms. Hemphill would be suspended for five days, beginning May 26, 2004, for having social contact with Plaintiff outside of work, despite her November 3, 2003 warning. In addition, Ms. Hemphill was reassigned to the day shift. Ms. Saunders did not make a formal determination as to whether or not Ms. Hemphill had sexually harassed Plaintiff.

Following her suspension, Ms. Hemphill took a medical leave of absence and did not work from June 5, 2004 to July 2004.

Plaintiff did not work with Ms. Hemphill again after May 17, 2004. In addition, after May 17, 2004, Plaintiff did not have any further "incidents" with Ms. Hemphill, nor did he complain about Ms. Hemphill again.

Beginning in late May / early June 2004, Plaintiff began to send Ms. Reed numerous e-mails, some of which Ms. Reed found to be inappropriate. For example, on May 20-21, 2004, Plaintiff sent Ms. Reed nine (9) different e-mails which documented the number of personal telephone calls made or received by his co-workers during the shift. Ms. Reed had not instructed or requested Plaintiff to do this.

On June 7, 2004, Plaintiff sent Ms. Reed an e-mail in which he inquired as to why the laboratory was running urine controls for serum tests when, in his opinion, serum controls should be run for serum tests and urine controls for urine tests. Ms. Reed provided Plaintiff with an explanation; however, Plaintiff disagreed with Ms. Reed's conclusion. Accordingly, Ms. Reed instructed Plaintiff to perform the necessary research and come up with an answer. In response, Plaintiff sent Ms. Reed an e-mail in which he stated, "I would be more than gladly (sic) to help you. However, these consulting issues would require a fee. I charge about $500.00 hr. Let me know . . . ." When Ms. Reed asked Plaintiff if he was joking, he replied that he worked as a consultant "on the side." Following this conversation, Ms. Reed reported Plaintiff's conduct to Ms. Naples.

Ms. Naples then sent Plaintiff an e-mail in which she instructed that he was to follow Ms. Reed's directions, treat her with courtesy and respect, and avoid insubordinate behavior.

Ms. Naples also met with Plaintiff to discuss the issue. Plaintiff was not disciplined as a result of the incident.

In or around June 2004, Ms. Reed met with her lab staff to inform them of anticipated schedule changes, as Ms. Hemphill was going to be assigned to the day shift upon her return from her leave of absence. Following the meeting, Marty Kling, another MLT, asked Ms. Reed why SMH had hired Plaintiff when he had "walked off the job" at Mercy Divine Providence Hospital ("Divine Providence"). Prior to speaking with Mr. Kling, Ms. Reed was not aware that Plaintiff had worked at Divine Providence because this information was not included on his employment application.

Ms. Reed then reported this information to Ms. Saunders and asked why SMH would not have had this information at the time Plaintiff was hired. Ms. Saunders reviewed Plaintiff's employment application and determined that Plaintiff had not disclosed his 2001 employment at Divine Providence on his application despite the fact that the application specifically requested this information. The Human Resources Screening Services of SMH was contacted, who then independently verified that Plaintiff had in fact been employed at Divine Providence in 2001, despite no reference about prior hospital experience being listed on Plaintiff's employment application. The SMH corrective action policy specifically provides that "withholding or providing false, material information in an employment application" is grounds for immediate termination of employment.

Meredith Naples, Susan Hoolihan, and Roseanne Saunders made the decision to terminate Plaintiff's employment for withholding material information. Consequently, Plaintiff was terminated on June 14, 2004.

## STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

With respect to summary judgment in discrimination cases, the Court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987). The task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory or retaliatory purpose. *See Ezold v. Wolf,*

*Block, Schorr & Solis-Cohen*, 983 F.2d 509, 525 (3d Cir. 1992), *cert. denied*, 510 U.S. 826 (1993).

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

## DISCUSSION

A. *Sexual Harassment*

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 20002-2(a)(1).[2] In order for a plaintiff to establish a hostile work environment, he must show harassing behavior "sufficiently severe or pervasive to alter the conditions of his employment." *Pennsylvania State Police v. Suders*, 532 U.S. 129 (2004) (*citing Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993)).

In determining whether an environment is sufficiently hostile or abusive, courts must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v.*

---

[2] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See Kelly v. Drexel Univ.*, 94 3 F.3d 102, 104 (3d Cir. 1996). Therefore, the disposition of Plaintiff's Title VII claims applies with equal force to his PHRA claims.

12

*City of Boca Raton*, 524 U.S. 775, 787-88 (1998). The conduct "must be extreme to amount to a change in the terms and conditions of employment." *Id.*

The standard of employer liability under Title VII varies depending on whether the alleged harasser was a supervisor or merely a co-worker. *See, e.g., Faragher,* 524 U.S. at 775. In order to establish a claim for sexual harassment based on the conduct of a co-worker, the plaintiff must prove: (i) he suffered intentional discrimination because of his sex; (ii) the discrimination was severe or pervasive;[3] (iii) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondent superior liability. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990).

"Liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Id*. at 1486. Once an employer has notice of the alleged harassment, it must promptly and adequately address the situation. *Maher v. Associated Servs. for the Blind*, 929 F. Supp. 809, 813 (E.D. Pa. 1996), *aff'd*, 107 F.3d 862 (3d Cir. 1997). An employer's remedial action is adequate if it was reasonably calculated to prevent further harassment. *Knabe v. Boury Corp*., 114 F.3d 407, 414 (3d Cir. 1997).

SMH contends that summary judgment should be granted because (i) the alleged conduct on which Plaintiff bases his claim was not unwelcome or severe or pervasive enough to

---

[3] While the *Andrews* court stated that the discrimination in question must have been "pervasive and regular," the United States Supreme Court has employed a "severe or pervasive" standard. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (1002), which the Third Circuit recently adopted, noting that "[t]he difference is meaningful, and the Supreme Court's word controls." *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 20026), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, -- U.S. ---, 126 S.Ct. 2405 (2006).

alter the conditions of his employment and create an abusive working environment and (ii) there is no basis from which to impose respondeat superior liability.

Plaintiff alleges that Ms. Hemphill, his co-worker, began to harass him in May or June of 2003. However, by Plaintiff's own admission, he did not inform either his supervisors or anyone in the SMH human resources department that Ms. Hemphill was allegedly sexually harassing him until May 2004. (Kellerman depo. at 324-325; Reed Depo. at 90; Saunders Depo. at 13; Naples Depo. at 31-32). The record reflects that prior to that time, while Plaintiff had generally complained about Ms. Hemphill "bothering him," he had not provided management with examples of any specific conduct or comments he found objectionable.

Once aware that the alleged conduct of Ms. Hemphill was sexual in nature, Ms. Saunders immediately investigated the situation and promptly took action. Ms. Hemphill was suspended for five days and transferred to a different shift. It is not disputed that after Plaintiff complained in May 2004, he and Ms. Hemphill never worked together again and that he had no further incidents with Ms. Hemphill. The record is clear that the actions of SMH immediately following Plaintiff's May 2004 complaint promptly and adequately addressed Plaintiff's concerns.

Additionally, although Plaintiff did not mention alleged sexual harassment in his prior complaints about Ms. Hemphill, SMH promptly addressed Plaintiff's concern in those instances as well. For example, after the November 2003 meeting in which Plaintiff complained that Ms. Hemphill was "bothering" him, SMH issued Ms. Hemphill a verbal warning and instructed her that she was to cease all non-work contact with Plaintiff. Following this incident,

Ms. Reed would periodically check in with Plaintiff to make sure things were "ok" and that Ms. Hemphill was no longer bothering him. Plaintiff confirmed that things were "ok."

Accordingly, the Court finds and rules that the evidence presented by Plaintiff is insufficient to prove that management-level employees had actual or constructive knowledge about the existence of a sexually hostile work environment and/or that SMH failed to take prompt and remedial action. *Andrews*, 895 F.2d at 1469. To the contrary, the Court finds and rules that the undisputed record evidence establishes that once Plaintiff informed SMH management of his sexual harassment allegations, SMH management promptly investigated the matter and took action to remedy the situation in a prompt and responsible manner.[4]

II.     *Retaliation*

Title VII provides, in pertinent part, as follows:

It shall be an unlawful employment practice for an employer to
discriminate against any of his employees . . . because he has opposed
any practice made an unlawful employment practice by this subchapter, or
because he has made a charge, testified, assisted, or participated in any
manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In order to establish a claim of retaliation under Title VII, a plaintiff must prove that (i) he engaged in activity protected by Title VII; (ii) the employer took an adverse employment against him; and (iii) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of*

---

[4] Because the Court has found that there is no basis from which to impose respondeat superior liability, it is not necessary to address the issue of whether the alleged conduct was not welcome or severe or pervasive enough to alter the conditions of Plaintiff's employment and create a hostile working environment.

*Philadelphia*, 461 F.3d 331 (3d Cir. 2006). SMH contends that Plaintiff cannot establish a retaliation claim as he cannot establish the first and third elements of his *prima facie* claim. The Court will first address the latter argument made by SMH.

Plaintiff relies on timing alone as proof of the causal connection between his complaint of sexual harassment and the termination of his employment. However, timing, in and of itself, is not sufficient to establish a retaliatory motive. *Delli Santi v. SNA Insurance*, 88 F.3d 192, 199 (3d Cir. 1996).

"The requisite causal connection may be established by showing a close temporal proximity between the protected activity and the alleged retaliatory conduct, or by submitting "circumstantial evidence . . . that give[s] rise to an inference of causation." *Samuels v. Postmaster General,* No. 07-3823, 2007 WL 4351227, at *2 (3d Cir. Dec.13, 2007) (quoting *Marra v. Philadelphia Hous. Auth.,* 497 F.3d 286, 302 (3d Cir. 2007)). The adverse employment action must have taken place after or at the same time as the employee's protected activity in order to show the required causal connection. *Fielding v. Temple University,* 2007 WL 3047238, at *9 (E.D. Pa. 2007) (citing *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1301 (3d Cir. 1997)). In addition, evidence that can be considered probative of the causal link between protected activity and an adverse employment action "is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus," but can be "other evidence gleaned from the record as a whole from which causation can be inferred." *Farrell,* 206 F.3d at 281 (3d Cir. 2000).

SMH has articulated a non-discriminatory and non-retaliatory reason for the termination of Plaintiff's employment (withholding material information on his employment

16

application). Therefore, to avoid summary judgment, Plaintiff must adduce evidence sufficient to prove that retaliation was the real reason that SMH terminated his employment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000); *see also Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir. 1991) ( "Merely reciting that [discrimination or retaliation] was the reason for the decision does not make it so.")

Plaintiff must prove pretext by pointing to specific record evidence from which a reasonable factfinder could (i) disbelieve SMH's articulated non-discriminatory, non-retaliatory reason; or (ii) otherwise believe that an invidious discriminatory reason (*i.e.* retaliatory motive) was more likely than not a determinative cause of the termination of his employment. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

After a careful review of the summary judgment evidentiary record, the Court finds and rules that Plaintiff has not contradicted or otherwise controverted SMH's articulated reasons to terminate his employment.

The record is clear that the corrective action policy of SMH provides that a misrepresentation on its employment application will be considered sufficient cause for dismissal. Plaintiff admits that in response to the question, "[w]ere you previously employed by any other hospital," he checked "no." Plaintiff further admits that on his employment application he described his entire relevant work history as: Best Buy; Primary Health Care; and CCAC.

The record is also clear that SMH management did not have any knowledge that Plaintiff had worked at Divine Providence until June 2004, when a co-worker, Marty Kling, told Ms. Reed that Plaintiff had worked there and had walked off the job. At that point, SMH

17

conducted another background check, which revealed that Plaintiff had, in fact, worked at Divine Providence and had not disclosed this information on his employment application. Plaintiff's termination was consistent with SMH's corrective action policy.

For all the foregoing reasons, the Court finds that SMH is entitled to summary judgment because Plaintiff has not produced adequate evidence from which a reasonable factfinder could conclude that SMH's legitimate, non-retaliatory business reason for the termination of Plaintiff's employment was a pretext or that its real motivation was a retaliatory animus based on Plaintiff engaging in protected activity.[5]

## CONCLUSION

For all these reasons, the motion for summary judgment filed by Defendant, UMPC St. Margaret, will be granted. An appropriate Order follows.

McVerry, J.

---

[5] Because the Court has found that there was no causal connection between Plaintiff's complaint of sexual harassment and the termination of his employment, it is not necessary to address whether Plaintiff actually engaged in protected activity.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC KELLERMAN, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 06cv0528 |
| | ) | |
| UPMC ST. MARGARET, | ) | |
|     Defendant. | ) | |

## ORDER OF COURT

AND NOW, this 11th day of February, 2008, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the Motion for Summary Judgment filed by Defendant, UPMC St. Margaret, is **GRANTED** and judgment is hereby entered in favor of UPMC St. Margaret.

    BY THE COURT:

    s/Terrence F. McVerry
    United States District Court Judge

cc:    John E. Black, III, Esquire
        Ogg, Cordes, Murphy & Ignelzi
        Email: jblack@ocmilaw.com

        Samuel J. Cordes, Esquire
        Ogg, Cordes, Murphy & Ignelzi
        Email: scordes@ocmilaw.com

        Allison Feldstein, Esquire
        Eckert, Seamans, Cherin & Mellott
        Email: afeldstein@eckertseamans.com